IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

STEVEN SMITH,                          )
              Plaintiff,      )
                          )
v.                                     )     CIVIL ACTION NO.  1:22-cv-00149
                          )
AUGUSTA-RICHMOND COUNTY,               )
    GEORGIA; RICHARD                   )
     ROUNDTREE, individually           )
    and in his official capacity as    )
    Sheriff of Richmond County,        )
    Georgia; DEPUTY MARLON             )
    SMITH, individually and in his     )
    Official capacity as a sworn       )
    Officer of the Richmond County     )
    County Sheriff's Office;           )
    Sheriff's Office; LIEUTENANT       )
     DANNY WHITEHEAD,                  )
    Individually and in his official   )
    capacity as a sworn officer of the )
    Richmond County Sheriff's Office   )
    and JOHN DOE DEFENDANTS            )
    ONE THROUGH SIX, presently        )
    unidentified to Plaintiff, each of )
    whom is sued individually and in   )
    his capacity as a sworn officer    )
    of the Richmond County Sheriff's   )
    Office,                            )
                Defendants.       )

PLAINTIFF'S SURREPLY IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Plaintiff limits his surreply to Defendants' Reply Brief, Dkt Item 58, to three points that he

believes are clarified by further comment.  He addresses each below.

      1.  Defendants' argument for summary judgment on the constitutionality of the New
Ordinance.

      Defendants contend that Plaintiff "misinterprets statements in *McCullen v. Coakley* to

argue that the analysis of determining whether a regulation is content based has somehow changed

. . ." Defendants' Reply Brief, Dkt Item 58, p. 2.  This misses Plaintiff's point entirely.  The point made by Justice Roberts in *McCullen* is so relevant to the present case that it would control it were it not dictum  Justice Roberts' statement in *McCullen* (concurred in without quibble by five other members of the Supreme Court, making a majority of six) is simply that "the Act *would not be content neutral* if it were concerned with undesirable effects that arise from "the direct impact of the speech on its audience" or "[l]isteners' reactions to speech."  If, for example, the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict speech." *McCullen v. Coakley,* 573 U.S. at 481.

Yes, this statement in *McCullen* is *dictum*.  The point is that it exactly describes the case now before this Court, and it was the statement of six members of the Supreme Court in 2014. Neither the Supreme Court nor the Eleventh Circuit Court of Appeals has subsequently considered a case embodying Justice Roberts' hypothetical. That case has now arisen in this Court and is a matter of first impression.  If the Supreme Court was right in stating in 2014, albeit as *dictum,* that an enactment is not content neutral if it depends for its justification on a concern with undesirable effects that arise from the direct impact of the speech on its audience, then the New Ordinance has to judged by strict scrutiny, which Defendants have not, on the present Record, even attempted to meet.

It is true, however, that if the New Ordinance in the present case cannot pass even intermediate scrutiny, then the question of first impression need not be resolved.  Defendants have not shown that as a matter of law the New Ordinance can withstand such intermediate scrutiny, which is their burden on motion for summary judgment.

Defendants' answer is that they have no burden on summary judgment, even though they are the movants. Defendants begin their discussion of the issue with the bolded statement that "Plaintiff has not shown that Augusta's noise ordinance is unconstitutional". This is not Plaintiff's burden. On motion for summary judgment, even if we assume that Defendants have made a *prima facie* case for the validity of the ordinance (which they have not), it is the burden of Plaintiff, on a summary judgment motion, to bring forth evidence to dispute this *prima facie* case. Plaintiff has done so, by pointing to evidence that casts grave doubt on a key element that Defendants, not Plaintiff, must satisfy to uphold the City's New Ordinance. To be entitled to summary judgment, Defendants must convince the Court that the New Ordinance, narrowly tailored or not, serves (to use Defendants' own language) "a significant government interest". This is not a notional or hypothetical point. As Plaintiff pointed out in his Response Brief, Dkt Item 53, p. 28, *McCullen* states clearly, indeed as clearly as possible (and not hypothetically or as dictum, since it was on this very point that the Supreme Court's decision in *McCullen* turned) that, even on intermediate scrutiny, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests.." 573 U.S. at 495. Admittedly, the *McCullen* courts use of the unequivocal language of "must demonstrate" was in the context of "narrow tailoring", but it would be a distinction without a difference to suggest that the same requirement does not require the government also to demonstrate that there is a substantial governmental interest in the first place. Defendants have not done so. *A fortiori,* they have not demonstrated this to a summary judgment standard.

To grant summary judgment to Defendants on this Record would be to hold that the mere invocation of a concern with excessive noise is sufficient to meet the concern expressed by the six members of the majority in *McCullen v. Coakley*, regardless of the fit that may or may not exist

between a problem which may nor may not be real and a legislative response that may or may not be meaningful.

Defendants' argument is based on their claim that the New Ordinance is only directed at loud noises, not at speech.  The fact is that Augusta has chosen to regulate speech, not "loud noises".  Defendants say that Augusta's concern in the New Ordinance is with "loud, unnecessary or unusual noise or any noise which either annoys, disturbs, injures, or endangers the comfort, repose, health, peace or safety" of Augusta's citizens, quoting from Section 3-6-1 of the New Ordinance.  They apparently seek, therefore, to read the provisions of Section 3-6-3, which is the section under which Plaintiff has been charged, with which he is threatened, and which was added to the city's noise regulation ordinance in response to problems with enforcement of its prior ordinance, *in pari materia* with Sections 1 and 2.  In that case, the New Ordinance evidently excepts from its operation 10 categories of "loud noise" which together would appear to eliminate any regulation of noise other than that produced by the human voice.  These include, for instance, "noise generated from celebrations, outdoor festivals, and/or municipally sponsored events or approved events which were approved by contract, permit or otherwise"; "noises resulting from any event sponsored by, associated with, or approved by a recognized institution of learning; "noises that result from or arise out of or stem from the occurrence of professional sporting event [sic] or organized sports league; and "noises and/or sounds to be made by manufacturing, governmental, or commercial entities in the normal course of their business."  Section 3-6-3 itself, which creates the "health care facility zones", states that "no persons shall shout or cause to be produced . . . any amplified sound".  This is vague as to whether "shouts" are proscribed only if they are produced by amplification, but for purposes of argument let us assume that "shouts" are proscribed regardless of "amplification".   In this case, what is prohibited by the ordinance is

"shouting", which can only mean "loud speech", on the one hand, and on the other hand, "amplified" sounds.

In *Harborside Place, LLC v. Town of Jupiter, Florida,* 958 F.3d 1308 (11th Cir. 2020), the Eleventh Circuit was presented with a challenge to a municipal noise regulation ordinance which prohibited "amplified" sound, but not other kinds of sound.  In this respect, the ordinance at issue was similar to the New Ordinance at issue herein.  The procedural posture of the case was like that in *Pine, supra,* an interlocutory appeal from the denial of a motion for preliminary injunction. Writing for the Court of Appeals, Judge Jordan acknowledged that the issue of whether *Reed v. Town of Gilbert* required strict scrutiny (as argued herein by Plaintiff in his Response Brief) was presented, but justified his decision to punt on the issue on the ground that the matter for review was a request for a preliminary injunction:

> Although we can sometimes decide legal issues conclusively in preliminary injunction appeals [citation omitted], the Supreme Court has said that "limited [abuse of discretion] review normally is appropriate." . . . in [deciding the present case on such limited review], we intimate no view as to the ultimate merits of appellee's contentions."

-- 958 F.3d at 1314.

Judge Jordan additionally took the somewhat unusual step of discussing a case that "we believe is relevant", though not cited by either party, noting with apparent approval that in that case the Eleventh Circuit had declined "to reach the merits of a Second Amendment claim in a preliminary injunction appeal because, among other things, the record was not fully developed and the parties had not briefed an important historical issue." *Id.*

Further comments in *Harborside* are relevant here.  The Eleventh Circuit clearly recognized the likely applicability of *Reed v. Town of Gilbert* to the strict scrutiny argument in the question of the constitutionality of the Jupiter noise ordinance, in particular where the challenge is

not that the ordinance is not to what it says on its face, but rather as to whether it depends in fact on an attempt to regulate based on content.  958 F.3d at 1316-1323.  After this lengthy discussion acknowledging the relevancy of *Reed,* Judge Jordan concluded, with evident relief, that the issue could be postponed for another day: "We therefore do not definitively decide whether [the ordinance] is on its face a content-based or content-neutral regulation of speech.  We hold only that the district court did not abuse its discretion in denying [preliminary] injunctive relief".  *Id.* at 1322.

There is no further reported history of the *Harborside* case.  So far as precedent is concerned, the denial of preliminary relief caused it to sink below the waves of time and plaintiff discouragement, just as happened in the *Pine* case.  Here Plaintiff has been careful to avoid this result, eschewing the effort to obtain a preliminary injunction.  Defendants, however, wish to conclude this litigation on summary judgment, but without making the effort required of a defendant in circumstances like these, which is conclusively to justify its prohibition of speech protected by the First Amendment.  Plaintiff respectfully submits that, while the evidence in the case is now closed, it is Defendants, not Plaintiff, who have so far failed to carry their burden. The burden in such a case is very clear:  in Judge Jordan's words (quoting directly from *Reed v. Town of Gilbert*), "content-based laws which 'target speech based on its communicative content' are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  958 F.3d at 1316.  On the present Record, Plaintiff has demonstrated (1) that the regulation in question, if it is truly directed to the protection of patients (which is the only purpose for the ordinance that has been suggested by Defendants) necessarily involves a content-based restriction, and that (2) Defendants have failed even to demonstrate that an actual compelling state interest exists which the regulation in question

addresses. The fact is that, given Defendants' minimalist approach to justifying the New Ordinance, the Court would be well within its authority in granting, *sua sponte,* a summary judgment for Plaintiff on the issue of the constitutionality of the New Ordinance.

The entire purpose of the whole realm of "heightened scrutiny", whether strict or intermediate, has been well characterized by a law review writer: "Though its exact origins are somewhat unclear, the [Supreme] Court created heightened scrutiny to "selectively shift[]" the burden of proof to the government when it enacted "undesirable legislation restricting fundamental rights." Nasrallah, Note: *Preventing Conflict or Descending an Iron Curtain? Buffer-Zone Laws and Balancing Histories of Disruption with Free Speech*, 66 Case W. Res. 849 (2016). *See also* Phillipps, Note: *The Unavoidable Implication of McCullen v. Coakley: Protection Against Unwelcome Speech is Not a Sufficient Justification for Restricting Speech in Traditional Public Fora,* 47 Conn. L.Rev. 937 (2015).

In the present case, to allow the City to use decisions like *Pine* and *Harborside,* both of which addressed only motions for preliminary injunction, to obtain summary judgment in this case would simply be to immunize any purported "noise" regulation in this area from ever being reviewed according to the standards of *McCullen* and *Gilbert* or indeed of any heightened scrutiny whatsoever.

The speech prohibited by the New Ordinance is core First Amendment speech. Even under intermediate scrutiny, the City is not entitled to summary judgment, or any judgment, if it fails to meet the standards enunciated most recently by the Supreme Court in *McCullen v. Coakley, supra.* "Consistent with the traditionally open character of public streets and sidewalks, we have held that the government's ability to restrict speech in such locations is "very limited". *McCullen v. Coakley,* 573 U.S. at 477. Even if an enactment is deemed to be content neutral, and thus subject

only to intermediate scrutiny, it nevertheless must be "narrowly tailored" to serve a "significant governmental interest", and must "leave open ample alternative channels for communication of the information." *Id.*   In this case, the only justification even offered by Defendants for the New Ordinance is the effect of the noise of Plaintiff's speech on patients of the abortion facility.  From the testimony of the abortion facility's own doctor, Plaintiff has shown that this supposed effect is not a "significant governmental interest" in the particular circumstances of this abortion facility at this time.  At the very least, on summary judgment it is incumbent on Defendants, as the proponents of summary judgment, to show that the governmental interest purportedly furthered by the New Ordinance is significant.  This they have failed to do, or even to attempt to do. They have produced no evidence at all from anybody that patients face a serious health risk, or any health risk, from the noise produced by the speech prohibited by the New Ordinance.  All they have provided, as a basis for a trial to be short-circuited in this case by summary judgment, is that patients may be "upset" by the prohibited noise.

It is true that, as this Court noted in describing the lenity of the requirements of intermediate scrutiny in *Discotheque*, that under intermediate scrutiny, "Augusta 'is not required to 'conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence [it relied] upon is reasonably believed to be relevant to the problem that [the challenged ordinance addresses[.]'  *Discotheque, supra,* 2021 WL 4166326, \*7.  Still, this requirement at least preserves the element that in fact the City did actually rely on something, not just that the City has provided an *ex post facto* justification.   In *Discotheque* relied on a record showing that the county commissioners had actually relied on something.  No such record exists here.  In the present case, there has been no showing whatever that the City considered any studies or any evidence, developed by anybody at all, to justify the New Ordinance, which has been used

only four times since its enactment, and on each of these four occasions prosecution has been abandoned by the City, thus showing that the City does not wish to expose its prohibition to judicial review.

The Eleventh Circuit has recognized that "a city may not regulate speech because it 'cause[s] offense or ma[kes] listeners uncomfortable." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,* 11 F.4th 1266, 1294 (11th Cir. 2021).   Yet that is all Defendants have shown. Intermediate scrutiny is still "heightened scrutiny" and requires at least that there be an actual showing that the supposedly significant governmental interest being furthered is actually significant.  Defendants here have not even attempted such a showing.  No one has shown that Plaintiff's activities, or any activities regulated by the New Ordinance, have ever caused any significant injury, or are likely to cause any such injury, to anyone.

## 2.   Deputy Smith's immunity defenses

As to Deputy Smith, Defendants have argued in their Reply Brief that as a matter of law Deputy Smith is entitled to federal qualified immunity on Plaintiff's federal claim and to Georgia "official immunity" on Plaintiff's state law claim.  Defendants' points are not well taken, but a Plaintiff believes a brief surreply will be helpful.

Beginning at the bottom of page 42 of Plaintiff's Response Brief (Dkt Item 53) and continuing through the middle of page 45, Plaintiff describes the extraordinary evidence relating to Deputy Smith's alleged viewing of a video that supposedly showed Plaintiff trespassing on the Abortion Facility's property, earlier in the day on which Deputy Smith subsequently arrested Plaintiff, *on the sole basis of the video*.  Plaintiff described how this evidence (even discounting Plaintiff's own testimony that he absolutely did not so trespass) creates a sharp factual  dispute as to (1) whether the video did in fact show that Plaintiff had trespassed earlier that day on the

9

property of the Abortion Facility and (2) as to whether Deputy Smith knew, based on his view of the video and what he was told by the Abortion Facility employee who showed it to him, that he was arresting the wrong man when he arrested Plaintiff based on the video, or that he knew this when he nevertheless decided to take Plaintiff to jail and commit him there to incarceration, all without a warrant.

At the referenced pages of his Response Brief, Plaintiff explained how these factual disputes create a fact question that must be resolved by a jury as to Deputy Smith's subjective motivation in arresting Plaintiff, which precludes summary judgment on his state law claim of immunity. Plaintiff refers also to his Affidavit submitted in opposition to summary judgment, Dkt Item 53-2, paragraphs 9, 19 and 20. However, in reviewing his Response Brief, Plaintiff has become convinced that he failed in his brief adequately and explicitly to explain how these same factual disputes preclude summary judgment on Deputy Smith's entitlement to federal qualified immunity on Plaintiff's federal claim against Deputy Smith. Briefly, while it is true that federal qualified immunity is based on an objective measure of what a reasonable police officer would have done "under the circumstances", nevertheless this must be applied to the facts of the situation as they are presented by evidence (that is, as to what the underlying circumstances were or could have been perceived by the defendant to be). Where this evidence itself is in question, a jury issue is necessarily presented. The evidence of the four videos discussed by Plaintiff at pages 42 through 45 of his Response Brief, together with the evidence of Plaintiff's Affidavit, create a fact question as to whether the Abortion Facility's video (which has now mysteriously disappeared) did in fact show Plaintiff trespassing on the Facility property at all, and as to whether Deputy Smith could reasonably have supposed that it did. These questions must be resolved by a jury, before the Court can conclude what a reasonable police officer would have done in the circumstances.

Defendants' argument as to Deputy Smith's liability under Section 1983 is two-fold, but both parts of it are based on a false premise. Admitting (at least for purposes of summary judgment) that Deputy Smith's arrest of Plaintiff was without a warrant (as shown conclusively by Plaintiff in his Response Brief), Defendants claim (1) that Deputy Smith had probable cause to arrest Plaintiff without a warrant, and (2) even if he did not have probable cause, he at least had "arguable" probable cause. Both these arguments, however, as made by Defendants, depend entirely on Deputy Smith's assertion that he was shown a video by an employee of the Abortion Facility, which showed that Plaintiff had earlier trespassed on the Abortion Facility's property. This, however, as demonstrated in Plaintiff's Response Brief, is disputed as a matter of fact. While the extent to which the admitted or proven facts of a case justify a finding of probable cause or arguable probable cause is a question for the Court, what those facts are is a question for a jury.

### 3.  State law liability of Sheriff Roundtree

Plaintiff has argued that Sheriff Roundtree can be held liable for the wrongful arrest and wrongful incarceration of Plaintiff under the doctrine of *respondeat superior.* Defendants' response is limited in Defendants' Reply Brief, Dkt Item 58, pages 10 and 11. Defendants argue that a sheriff cannot be sued in his individual capacity under the doctrine of *respondeat superior,* and that because a sheriff can be sued on this theory only in his official capacity, he has sovereign immunity. Both these claims must be true in order to sustain Defendants claim that a sheriff is basically entirely immune from any level of legal responsibility for his deputies' acts, absent the sheriff's personal involvement. However, both are incorrect.

Defendants concede, as they must in light of *Gilbert v. Richardson,* 264 Ga. 744 (1994), that in the absence of "sovereign immunity" a sheriff can be held liable for the acts of his deputies under the doctrine of respondeat superior, even where the deputies themselves would be entitled

to "official immunity" and that under *respondeat superior* the sheriff is not entitled to "official immunity".  This is an express holding of *Gilbert*:

> Under the doctrine of respondeat superior, a principal has no defense based on an agent's immunity from civil liability for act committed in the course of employment.  Restatement (Second) of Agency Section 217(b)(ii) (1958).  "Immunities, unlike privileges, are not delegable and are available as a defense only to persons who have them . . .[Where] the agent acts in the scope of employment, the fact that the agent has an immunity from liability does not bar a civil action against the principal." Id.  comment b.  Thus, the Court of Appeals has held that private employers could be liable for the negligent acts of their employees, despite the employees' immunity from liability. [citations omitted]
>
> Following this rule, we hold that the official immunity of a public employee does not protect a governmental entity from liability under the doctrine of respondeat superior. A county may be liable for a county employee's negligence in performing an official function to the extent the county has waived sovereign immunity. [citing cases from Maryland, Massachusetts, Pennsylvania and Wisconsin].

-- 264 Ga. at 754.

The *Gilbert* court had no occasion to determine whether a sheriff could be sued under *respondeat superior* in his individual capacity, because it found that the sheriff in that liable in his official capacity.  Indeed, the case as reported, both in the Court of Appeals and in the Supreme Court, does not even reflect whether the sheriff was sued in his individual capacity.

Although their argument requires for its success that a suit against a sheriff on the basis of *respondeat superior* must be a suit against him in his official capacity, *Gilbert* does not say that. To supply this gap, Defendants rely on *dictum* of the Georgia Supreme Court in the subsequent case of *Seay v. Cleveland,* 270 Ga. 64 (1998), which was then repeated, but again as dictum and in reliance solely on the *Seay* dictum) by the Georgia Court of Appeals in a footnote in its own

subsequent case, *Nathan v. Prather,* 286 Ga.App. 889, 893 fn 6 (2007).   Neither of these two

footnotes, both dictum and one dependent entirely on the other, is good law.

   *Seay v. Cleveland,* 270 Ga. 64 (1998) was a case in which a sheriff was sued in his official

capacity.   It does not involve a suit against a sheriff in his individual capacity.   Indeed, the case

specifically acknowledges this: "Although Seay might be held liable for negligent supervision had

he been sued in his personal capacity . . ."  270 Ga. at 65.   In footnote 1 in *Seay*, as cited by

Defendants, Justice Hunstein had the following to say:

> For the benefit of both the bench and bar, we reiterate what we said
> in *Gilbert*:  a sheriff sued in his official capacity may be held liable
> for the negligent performance of ministerial or discretionary acts of
> his employees only to the extent the county has waived sovereign
> immunity because he can only be sued in his official capacity under
> respondeat superior.   *Gilbert*, supra at 754,. . . As to acts or
> omissions personal to the sheriff, however, he may be sued in his
> personal capacity and will be protected from such suits only to the
> extent official or qualified immunity applies.

<div align="center">-- <em>Id</em>. at 750. [1]</div>

   The problem with Justice Hunstein's footnote "for the benefit of the bench and bar" is that

that the Georgia Supreme Court in *Reed v. Gilbert* did not actually say that a sheriff could not be

sued individually under *respondeat superior.*  Given that *Reed v. Gilbert* does note that at common

law a sheriff could be sued "personally" for their own defaults, it surely does not follow that at

common law they could not be sued personally for the defaults of their deputies.   As Plaintiff

---

[1] Plaintiff's counsel admits that he was not aware of this footnote when he wrote Plaintiff's
Response Brief herein.   If he had known of it, he would have brought it to the Court's attention
himself, even though he believes it should not be read as broadly as Defendants wish.   Further,
Plaintiff's counsel has not failed to note the irony that on this state law question he seeks to
discount dictum of the Georgia Supreme Court, whereas in his federal law argument above, section
1 of this brief, he underlines the importance of a dictum from the United States Supreme Court.
The law, however, is not without irony even when correctly applied.

shows further below, such responsibility of a sheriff for the acts of his deputies has been a commonplace of Georgia law for many years.

As demonstrated above, the linchpin of Defendants' argument that sovereign immunity bars any suit against Sheriff Roundtree for Plaintiff's false imprisonment is the view that an action against Sheriff Roundtree concerning the matter would have to be one against Sheriff Roundtree in his official capacity.  Defendants cite no authority for this proposition, because there is none other than Justice Hunstein's footnote *dictum* in 1998.

It is undisputed that at common law a sheriff was personally liable for the acts of his deputies.  In 2019, the Georgia Court of Appeals (though it held that a sheriff was not liable in the case because of the plaintiff's failure to give him *ante litem* notice) noted the "well-established line of jurisprudence, holding that "[t]he sheriff, and not the county, is liable for the misconduct of his deputies."  *Moats v. Mendez,* 349 Ga.App. 811, 817 (2019). Among the cases cited in *Moats* is *Brown v. Jackson,* 221 Ga.App. 200 (1996), wherein the court said that said that "the sheriff, and not the county, is liable for the misconduct of his deputies" and further that "[t]herefore, the Peach County Sheriff, and not Peach County, would have been the proper party to have been sued under a theory of respondeat superior."  221 Ga.App. at 201.

Even in *Nathan v. Prather, supra,* one of the two cases cited by Defendants for their argument that a sheriff sued under *respondeat superior* must necessarily have been sued in his official, as opposed to his individual, capacity, the Georgia Court of Appeals somewhat surprisingly (given the derivative dictum in its footnote 6), actually stated that  that, because deputy sheriffs are employees of the sheriff, not the county, "[t]he sheriff, and not the county, is liable for the misconduct of his deputies."  286 Ga.App. at 895, quoting *Brown v. Jackson,* 221 Ga.App. 200 201 (1996).

As a matter of history, Georgia courts have always allowed an action against a sheriff for false imprisonment.  It may be that in the two cases cited by Defendants, the litigants and even the court assumed that any such action would be against a sheriff in his official capacity. However, as a matter of history, this assumption is incorrect and has never been held to be correct by a Georgia appellate court.  To the extent that this may have been assumed, the assumption must be re-examined, as must all constructions of the sovereign immunity which the Georgia courts have extended to sheriffs, based on Paragraph IX, by the lengthy and scholarly decision of the Georgia Supreme Court in *Lathrop v. Deal,* 301 Ga. 408 (2017).

In *Lathrop,* the Georgia Supreme Court, on the basis of its careful review of the history of Paragraph IX, emphasized with great clarity that the purpose of Paragraph IX was not to extend or modify the doctrine of sovereign immunity in Georgia, but only and particularly to "freeze" that doctrine at the point it had reached in the courts of Georgia as of the time a predecessor amendment to the Constitution became effective, that is in 1973.  *Lathrop* makes it plain that cases after 1973 that treated sovereign immunity as a matter for the courts to determine as a matter of policy, were incorrectly decided, and more precisely, that whatever was the law of sovereign immunity in Georgia in 1973 remains the law in that area today.  The purpose of Paragraph IX, which became effective in that year, was to insure that Georgia sovereign immunity law as it existed at that time, would remain unchanged unless the General Assembly, not the courts, decided otherwise.

The issue addressed in 2017 by *Lathrop v. Deal, supra,* was whether Georgia sovereign immunity precluded actions against state officials for injunctive relief. was whether the sovereign immunity of the State, as stated by Paragraph IX, prohibited suits for injunction against state officials.  301 Ga. at 408.  The *Lathrop* court undertook what it clearly intended to be a definitive statement about the contours of Georgia sovereign immunity law, which is too lengthy and

comprehensive to compress into a quotation.  The substance of the Georgia Supreme Court's decision was that the doctrine of sovereign immunity, as it existed in Georgia courts in 1973, has been "constitutionalized" in such a way that the courts of Georgia as of that date were deprived of the right to change any aspect of the law of sovereign immunity beyond what existed through court decisions as of 1973.

The liability of a sheriff for the defaults of his deputies was well-established at common law.  This is what today would be called *respondeat superior* liability.  Plaintiff has found no case expressly curtailing that liability at any point, either before or after 1973.  It should be clear from *Lathrop* that such liability has not been eliminated from Georgia law, and certainly not by virtue of a footnote *dictum* in 1998.  That a county could be liable for such defaults only because it had, pursuant to authority from the General Assembly to do so, waived its sovereign immunity, was a legitimate and indeed necessary conclusion of the court in *Gilbert v. Richardson, supra.*  That a sheriff was immune by virtue of sovereign immunity from suit in his personal capacity for the defaults of his deputies, under the theory of *respondeat superior*, was not a legitimate conclusion and was not one drawn by the court in *Gilbert v. Richardson.*  This aspect of the common law has not been disturbed by the General Assembly.

In sum, the state of the law is now as follows:

(1) A sheriff does not have sovereign immunity from suit against him in his individual capacity for the acts of his deputies; and

(2) A sheriff can still be sued in his individual capacity for actions of his deputies; and

(3) in such suits, where a sheriff's liability is based, not on his own acts, but rather on those of his deputies under the doctrine of *respondeat superior,* he cannot claim official immunity either. The present action is such a suit.

This result is neither anomalous nor unreasonable.  It is undisputed that at common law a sheriff was personally liable for the acts of his deputies.  As demonstrated above, this has been and remains a feature of Georgia law, inherited from English common law.  Paragraph IX provided, what had not existed before, warrant for any officer of the state to be sued for his actions if they were malicious or intended to harm someone.  It did not immunize any state, county or municipal officer from any pre-existing liability he might have had under Georgia law.  Paragraph IX also "froze" the status of Georgia sovereign immunity (as opposed to "official immunity") law as it stood at the effective date of the amendment in 1993, the intention being that thereafter the contours of Georgia sovereign immunity would be subject to revision only by the General Assembly, no longer by the courts.  It is unreasonable to suppose that either of these new constitutional provisions was intended to reverse what has been, so far as Plaintiff has been able to find, the law of Georgia since the state's adoption of the common law in 1784.

The purpose of "official immunity" is to allow state officials to go about their day to day actions without fear of liability.  This makes sense when applied to a law enforcement officer called upon to make quick decisions in specific circumstances.  It is not desirable that such an officer, in the heat of the moment, should be troubled by fears that a wrong guess will make him liable, and thus be inhibited from carrying out his duties as aggressively as he might do in the absence of personal immunity so long as he acted in good faith.  It is another thing entirely to extend this immunity to the sheriff, a constitutional officer who has hired and should have trained the deputy.  In the sheriff's case, there is no need for him to be protected from a mistake made in the heat of the moment.  On the contrary, it is highly desirable that a sheriff should be constrained in his hiring and training of his deputies, by possible liability for their actions.  This will lead, not to undesirable timidity of a law officer enforcing the law, but rather to desirable caution and care

by an administrator in hiring and training.  The different treatment is readily understandable as a matter of policy.  It is also the choice that Georgia law has made.  To remove this salutary liability would in effect make a sheriff virtually exempt at state law from any meaningful responsibility for the independent acts of his deputies.  There is no reason to believe this result, so contrary to the historical common law and so unnecessary for any policy reason, was ever intended by the people of this state or has ever been countenanced by Georgia law.  There is simply no reason to believe that the People, in approving Paragraph IX as an amendment to the Constitution, and thereby withdrawing from the courts the power to alter sovereign immunity as it existed in 1993, but at the same time establishing as a part of the Constitution the then existing law of sovereign immunity as it had up until that time been developed by Georgia courts, intended to place sheriffs in an unprecedented position of privilege.

*Dicta* in state cases are not binding on this Court in a diversity case.  They can, however, be persuasive.  *See Towne Realty, Inc. v. Safeco Ins. Co. of America,* 854 F.2d 1264, 1269. (11th Cir. 1988): "Insofar as this passage addresses escape clauses and yet the case apparently did not involve any escape clauses, the statement is a dictum.  Even so, when considering a diversity case under state law, we are bound to decide the case they way it appears the state's highest court would, and we would be violating that duty to ignore the fact that this statement was made."

In the present case, then, this Court is called upon to make a prediction as to whether, in 2023, the Georgia Supreme Court would adopt Justice Hunstein's 1998 *dictum*, unsupported by either argument or citation of authority, that a sheriff can be sued through *respondeat superior* only in his official capacity.  Respectfully, the answer is no.  Even an accomplished jurist, such as Justice Hunstein most certainly was, can make a mistake, especially in *dictum* that is itself a matter of negative implication, and without the benefit of briefing.  Her footnote 6 in *Seay* is such.

More recent cases from the Georgia Supreme Court evince a very different attitude toward Paragraph IX and the sovereign immunity of state officers than was evident earlier, including in the 1990s, when Justice Hunstein's *dictum* was published.   This has come about because of a better understanding of the true intent of Paragraph IX, which was not to create new law of sovereign immunity, but only to "freeze" the existing common law of sovereign immunity, as developed by the courts as of 1993, so as to insure that in the future the General Assembly, not the courts, would be in charge of determining the contours of sovereign immunity.

Since 1993, the General Assembly has done nothing to suggest that it has curtailed the common law liability of a sheriff for the actions of his deputies.   This liability, based on the doctrine of *respondeat superior,* remains intact today, just as it existed before 1993 and has been recognized since.   There is no reason why it should not be applied in the present case.

<div style="margin-left:40%">

TURNER PADGET GRAHAM & LANEY, P.A.

/s/ Charles C. Stebbins, III
Charles C. Stebbins, III
Georgia Bar No.: 677350
Robert P. Mangum
Georgia Bar No.: 268222
PO Box 1495
Augusta, GA. 30903
(706) 722-7543
cstebbinsiii@turnerpadget.com
rmangum@turnerpadget.com
*Attorneys for Plaintiff*

</div>

## CERTIFICATE OF SERVICE

COMES NOW, the undersigned attorney for Steven Smith, Plaintiff in the **PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk's electronic filing system, which will automatically provide service to all counsel of record as follows:

> Frails & Wilson, LLC
> Tameka Haynes, Esq.
> thaynes@frailswilsonlaw.com.

This 10th day of October, 2023.

/s/ Charles C. Stebbins, III