IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

STEVEN SMITH,                          *
                                       *
          Plaintiff,                   *
                                       *
     v.                                *        CV 122-149
                                       *
AUGUSTA-RICHMOND COUNTY,               *
GEORGIA, et al.,                       *
                                       *
          Defendants.                  *
                                       *
                            _____

                        **O R D E R**
                            _____

     Before the Court are Plaintiff's unopposed "Motion to
Bifurcate Trial and to Combine Hearing on Interlocutory Injunction
with Trial on Permanent Injunction" (Doc. 37) (hereinafter,
"motion to bifurcate"); and Defendants' motion for summary
judgment (Doc. 43).[1]  For the following reasons, Plaintiff's
unopposed motion to bifurcate is **GRANTED**, and Defendants' motion
for summary judgment is **GRANTED IN PART and DENIED IN PART.**


                    **I. BACKGROUND**

     A Preferred Women's Health Center ("APWHC") is a medical
facility in Augusta, Georgia for women who want to diagnose and
terminate their pregnancies.  (Doc. 43-2, ¶ 1; Doc. 56, at 3.)  In
between the road and APWHC's parking lot, there is a grassy strip

_____

[1] Plaintiff also filed a motion for a hearing on Defendants' motion for summary
judgment.  (Doc. 55.)  Because the Court can resolve all pending motions without
a hearing, Plaintiff's motion for a hearing (Doc. 55) is **DENIED.**

that has a few trees and APWHC's business sign.  (Doc. 43-3, at 15; Doc. 53-2, at 15.)   Although the trees and APWHC's business sign may be private property, the Parties do not dispute the grassy strip is a public right-of-way.   (See Doc. 43-1, at 3, 16; Doc. 43-2, ¶ 10; Doc. 43-3, at 2, 8, 13, 19; Doc. 56, at 6.)   Almost every day for over six years, Plaintiff has protested abortion in front of APWHC.   (Doc. 43-2, ¶ 2; Doc. 56, at 3.)   On several occasions, the Richmond County Sheriff's Office has received complaints from APWHC and others while Plaintiff was protesting. (Doc. 43-2, ¶ 4; Doc. 56, at 3-5; Doc. 43-3.)   Three instances are relevant for resolving Defendants' motion for summary judgment.

## A. Encounter with Defendant Whitehead

On September 18, 2020, Defendant Whitehead responded to a noise complaint at APWHC while Plaintiff was present.   (Doc. 43-13, at 14:2-19.)   Defendant Whitehead told Plaintiff that, because he had been issued a citation earlier in the day, he had to leave the APWHC premises and, if Plaintiff did not comply, he would be arrested.   (Id. at 17:23-18:4; Pl.'s Sept. 18, 2020 Bodycam, Doc. 54, at 0:01-0:48.)   Plaintiff said he would pack his belongings and leave because he did not want to be arrested.   (Pl.'s Sept. 18, 2020 Bodycam, at 0:48-0:53.)   At the time Defendant Whitehead told Plaintiff to leave, Plaintiff was standing on the right-of-way in front of APWHC's facility.   (Doc. 43-13, at 18:5-14.)

**B. Encounter with Defendant Smith**

On November 20, 2020, Defendant Smith responded to a call at APWHC. (Doc. 43-15, at 31:4-7; see generally Def. Smith's Bodycam Doc. 54.)[2]  When Defendant Smith arrived at APWHC, he parked in the back of the facility, went inside, and was greeted by an APWHC employee. (Def. Smith Bodycam, at 0:00-0:50.)  The employee told Defendant Smith she saw "a protester" come onto APWHC's property, specifically in the parking lot. (Id. at 0:51-1:03.)  The employee then showed Defendant Smith a video of the protester that she recorded on her phone.[3]  (Id. at 1:05-1:35.)  From the video, a man in light-colored pants can be seen standing in APWHC's parking lot. (Id. at 1:25-1:27.)  In the background, two other individuals can be seen standing on the right-of-way, one of whom was wearing dark-colored clothing. (Id. at 1:30.)

After watching the video, Defendant Smith exited through the back of APWHC, entered his car, and moved it to a parking spot in front of APWHC to address the protesters. (Id. at 2:03-3:05.)  Defendant Smith then exited his vehicle and approached a person in dark-colored clothing, who was speaking to two other people while remaining on the right-of-way. (Id. at 3:09-3:17.)  Defendant Smith told the person in dark-colored clothing, who Defendant Smith identified as Plaintiff, to "move" and "get off the property."

---

[2] The Parties provided the Court with identical copies of Defendant Smith's bodycam footage from November 20, 2020. (Docs. 45, 54.)

[3] The APWHC employee's video is not in the record, so the only portions of the video available to the Court are those shown in Defendant Smith's bodycam footage.

(Id. at 3:18-3:22; Doc. 43-15, at 34:20-22, 39:9-11; Doc. 43-15, at 32:18-33:11.)  Defendant Smith and Plaintiff engaged in a back-and-forth exchange, where Defendant Smith repeatedly told Plaintiff to "get off the property," and Plaintiff responded that he was not on APWHC's property.  (Def. Smith's Bodycam, at 3:18-3:39; Doc. 43-15, at 32:18-33:11.)  When Plaintiff refused to leave the property, Defendant Smith arrested him for criminal trespass.  (Def. Smith's Bodycam, at 3:40-3:52, 4:08-4:10.)  Defendant Smith testified he based his decision to arrest Plaintiff on the video the APWHC employee showed him.  (Doc. 43-15, at 39:1-3, 39:15-25, 41:13-19, 51:7-12.)

## C. The New Ordinance

On July 1, 2021, the Commissioners of Defendant Augusta-Richmond County ("ARC") amended Augusta, Georgia Code ("A.G.C.") §§ 3-6-1 to 3-6-3 (the "New Ordinance").  (Doc. 43-2, ¶ 18; Doc. 56, at 8.)  The ARC Commissioners determined A.G.C. §§ 3-6-1 to 3-6-3 needed to be amended "so as to provide clarity with regards to enforcement."  (Doc. 53-1, at 11, 13.)  Pertinent here, A.G.C. § 3-6-3 of the New Ordinance provides:

> **Sec. 3-6-3 Health Care Facility Zones.**
> (a) *Purpose.*  There shall be within [ARC] what shall be known as health care facility zones around such hospitals, sanitoriums, physicians' offices, walk-in medical centers, medical diagnostic centers, surgical centers, and facilities which are licensed, certified or otherwise authorized to perform medical procedures in this state and to provide health services that are free from shouting and other amplified sounds.  "Health care facility" shall not include residential homes,

convalescent homes or other facilities that provide long term residency.

(b) *Limitations*. No person shall shout or cause to be produced, or allow to be produced, by any means, any amplified sound, including the playing, using, operating, or permitting to be played, used, or operated any radio receiving device, television, stereo, musical instrument, phonograph, tape or CD player, sound amplifier, or other machine or device that produces or reproduces amplified sound on any public street or sidewalk or from private property that is plainly audible at a distance of 100 feet of the property line of a property housing a health care facility or any other institution reserved for individuals seeking health care treatment, the sick, or infirmed, provided that the public streets or sidewalks adjacent to such facilities shall be clearly marked by conspicuous signs identifying those areas.

(c) *Signage required*. It shall be the duty of each health care facility or owner of such establishment to erect and maintain lampposts or signs in some conspicuous place on every street, avenue or alley in the vicinity of every health care facility, public or private. The signs which must meet and conform to the city's sign code shall be placed on such streets, avenues or alleys upon which a health care facility is situated and shall read in a manner similar to, but not restricted to, the following: "Hospital" or "Health Care Facility."

(Doc. 43-8, at 8; Doc. 53-1, at 8.) On June 28, 2022, Plaintiff was cited with violating A.G.C. § 3-6-3(b) of the New Ordinance. (Doc. 43-2, ¶ 25; Doc. 56, at 10; Doc. 43-9, at 1.)

**D. Plaintiff's Lawsuit**

Plaintiff filed this action on November 18, 2022. (Doc. 1.) Plaintiff brings four claims: (1) a claim for declaratory and injunctive relief seeking the Court deem the New Ordinance unconstitutional filed against Defendant Roundtree, in his official capacity, and Defendant ARC; (2) a § 1983 claim against all Defendants, except ARC, in their official and individual

5

capacities; (3) a § 1988 claim against all Defendants seeking attorneys' fees and expenses; and (4) a Georgia law claim for false arrest and false imprisonment against all Defendants, except ARC. (Id. ¶¶ 69-107.)[4]   Plaintiff also seeks attorneys' fees under Georgia law.  (Id. ¶ 108.)

On July 25, 2023, Plaintiff moved to bifurcate (Doc. 37), and on August 15, 2023, Defendants moved for summary judgment (Doc. 43).  The Court first addresses Defendants' motion for summary judgment, then considers Plaintiff's motion to bifurcate.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on each of Plaintiff's substantive claims.  (Doc. 43, at 2-24.)

### A. Legal Standard

Under Federal Rule of Civil Procedure 56, a motion for summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[4] Initially, Plaintiff's complaint named the following Defendants: (1) ARC; (2) Sheriff Richard Roundtree; (3) Deputy Marlon Smith; (4) Major Kevin Jones; (5) Lieutenant Danny Whitehead; and (6) six John Does.  (Doc. 1, at 1.)  On April 14, 2023, the Court granted Defendants' motion to dismiss Defendant Jones from this case and provided "Plaintiff may use the tools of discovery to identify the name of" fictitious parties and then amend to substitute.  (Doc. 33, at 2 n.1.)  "As a general matter, fictitious-party pleading is not permitted in federal court."  Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010).  There is "a limited exception to this rule when the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage.'"  Id. (quoting Dean v. Barber, 951 F.2d 1210, 1215 n.6 (11th Cir. 1992)).  Discovery is now closed, and Plaintiff still has not moved to substitute these fictitious parties.  Thus, the Court finds dismissal of Plaintiff's claims against Defendants John Doe 1-6 appropriate, and summary judgment is hereby **GRANTED** as to these claims.

6

judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'material' if . . . it might affect the outcome of the case . . . [and it] is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh the evidence or determine credibility. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998).

Defendants do not bear the burden of proof at trial and therefore may "satisfy [their] initial burden on summary judgment in either of two ways." McQueen v. Wells Fargo Home Mortg., 955 F. Supp. 2d 1256, 1262 (N.D. Ala. 2013) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)). First,

they "may simply show that there is an absence of evidence to support [Plaintiff's] case on the particular issue at hand." Id. (citation omitted).   If this occurs, Plaintiff "must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. (citation omitted).   Or second, Defendants may "provide affirmative *evidence* demonstrating that [Plaintiff] will be unable to prove [her] case at trial." Id. (citation omitted and emphasis in original).

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007).   Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the Parties specifically cite and legal arguments they expressly advance. See id.

In this action, the Clerk provided Plaintiff notice of the motion for summary judgment, the right to file affidavits or other

materials in opposition, and the consequences of default. (Doc. 44.) For that reason, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied. Plaintiff responded to the motion (Doc. 53), Defendants replied in support (Doc. 58), and Plaintiff filed a surreply (Doc. 63). The time for filing materials has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration. In reaching its conclusions, the Court evaluated the Parties' briefs, other submissions, and the evidentiary record in the case.

## B. Declaratory and Injunctive Relief

Plaintiff alleges the New Ordinance is unconstitutional, under both the federal and Georgia constitution, in all its sections both on its face and as applied to him. (Doc. 1, ¶¶ 69-93.) Defendants move for summary judgment on this claim arguing: (1) A.G.C. § 3-6-3 is a valid content neutral time, place, and manner regulation, (2) Plaintiff has not carried his burden to present a facial challenge to A.G.C. § 3-6-2, and even so, Plaintiff cannot show it is vague, (3) A.G.C. § 3-6-1 is not overbroad or vague, and (4) other courts have found similar ordinances constitutional under both federal and state law. (Doc. 43-1, at 2-11.) Plaintiff's response, while referencing the New Ordinance as a whole, only contains arguments about whether A.G.C. § 3-6-3 is unconstitutional under the federal constitution. (Doc. 53, at 4-30.) Thus, the Court treats Plaintiff's other arguments

9

as abandoned and will only address whether A.G.C. § 3-6-3 of the New Ordinance is constitutional under the federal constitution. Jones v. Bank of Am., N.A., 564 F. App'x 432, 434 (11th Cir. 2014) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed. . . . [W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (internal quotations omitted) (citations omitted)); see also Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001) (affirming summary judgment and finding claim abandoned when it was presented in complaint but not raised in initial response to motion for summary judgment).

A.G.C. § 3-6-3(b) prohibits a person from shouting or producing amplified sounds "on any public street or sidewalk or from private property that is plainly audible at a distance of 100 feet of the property line of a property housing a health care facility." (Doc. 53-1, at 8.)

> "In a public forum — such as the [public right-of-way] involved in this case — the government may impose reasonable restrictions on the time, place, or manner of protected speech, so long as the restrictions '[1] are justified without reference to the content of the regulated speech, . . . [2] are narrowly tailored to serve a significant government interest, and . . . [3] leave open ample alternative channels for communication of the information.'"

Pine v. City of W. Palm Beach, 762 F.3d 1262, 1268 (11th Cir. 2014) (alterations in original) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Plaintiff contends A.G.C. § 3-6-3 does

10

not satisfy the first of these prongs because it is content-based. (Doc. 53, at 11-25.)  Plaintiff argues Defendants have not provided a content-neutral justification for A.G.C. § 3-6-3 because the only justification they give for it is "protecting people who are seeking medical care from loud noises," but there is no evidence loud noises have any negative, physical impact on APWHC's patients. (Id. at 16, 18 (quoting Doc. 43-1, at 4).)  As a result, Plaintiff contends A.G.C. § 3-6-3 should be subject to strict scrutiny because it is "concerned with undesirable effects that arise from the direct impact of the speech on its audience or listeners' reactions to speech."  (Id. at 14 (quoting McCullen v. Coakley, 573 U.S. 464, 481 (2014) (internal quotation marks omitted and alterations adopted)).)  Defendants argue the text of the New Ordinance indicates it is not content-based.  (Doc. 43-1, at 3-4 (quoting A.G.C. §§ 3-6-1(a) & 3-6-3(a)).)  Thus, Defendants argue the New Ordinance, and specifically A.G.C. § 3-6-3, is content-neutral because "[n]othing in the text of the ordinance references the content of any speech and the ordinance applies equally to all ideas and messages."  (Id. at 4.)

"The first-step in evaluating the constitutionality of an ordinance which restrains protected speech or expression is to determine whether the government is proscribing the speech because it disfavors the message."  DA Mortg., Inc. v. City of Miami Beach, 486 F.3d 1254, 1266 (11th Cir. 2007) (citations omitted).  If so,

the ordinance will be subject to strict scrutiny; if not, the Court will apply intermediate scrutiny. Id. (citations omitted). "The government's purpose is the controlling consideration at this stage of the inquiry." Id. (citing Ward, 491 U.S. at 791). Moreover, the regulation of expressive activity will be deemed content-neutral if it is "justified without reference to the content of the regulated speech." Id. (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

Applying this standard to A.G.C. § 3-6-3, the Court concludes the ordinance is content-neutral. On its face, A.G.C. § 3-6-3(b) merely regulates the volume at which a person may speak or otherwise emit noise, but it does not discriminate or disallow speech based on the content of the message. (Doc. 43-8, at 8; Doc. 53-1, at 8.) In other words, to determine whether a person has violated A.G.C. § 3-6-3, one only needs to know whether the person emitted a noise "that is plainly audible at a distance of 100 feet of the property line of a property housing a health care facility," not what message is conveyed. (Doc. 43-8, at 8; Doc. 53-1, at 8.) Furthermore, A.G.C. § 3-6-3 applies to all facilities performing medical procedures, not just clinics offering abortions. (Id.) Thus, the Court finds A.G.C. § 3-6-3 is content-neutral, it survives intermediate scrutiny and passes constitutional muster as a reasonable time, place, and manner restriction. See DA Mortg., 486 F.3d at 1267.

To satisfy intermediate scrutiny, the New Ordinance must be "narrowly tailored to achieve a significant government interest and leave[] open ample alternative channels of communication." Id.  "The burden of justification is demanding[,] and it rests entirely on the State." United States v. Virginia, 518 U.S. 515, 533 (1996).   As the Supreme Court recently reiterated, "[g]overnment justifications for interfering with First Amendment rights must be genuine, not hypothesized or invented *post hoc* in response to litigation." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 543 n.8 (2022) (alterations adopted) (internal quotation marks and citation omitted).  Defendants assert the "significant government interest" A.G.C. § 3-6-3 was intended to achieve was protecting patients of health care facilities from loud noises. (Doc. 43-1, at 4-5.)  Plaintiff argues Defendants produced no evidence that the ARC Commissioners relied on the adverse health effects noise has on medical patients when it passed the New Ordinance; thus, summary judgment is inappropriate.  (Doc. 53, at 8-11.)

The Court agrees Defendants have not carried their burden to show A.G.C. § 3-6-3 was "narrowly tailored to achieve a significant government interest." DA Mortg., 486 F.3d at 1267.  The record is devoid of any evidence indicating the ARC Commissioners relied on how noise affects medical patients when it amended A.G.C. § 3-6-3. Indeed, when discussing why the ordinance needed to be amended,

the minutes from the ARC Commissioners' meeting say they amended it to make it easier for the Sheriff's office to enforce it.  (Doc. 53-1, at 11.)   The minutes do not explain how this version is easier to enforce than the previous version, and there is no discussion of problems with the previous version or how the new version resolves them.   (See id.)   Nor do Defendants present arguments in any of its briefing on this point.[5]  (See Doc. 43-1, at 4-5; Doc. 58, at 2-6.)  A.G.C. § 3-6-3(a) provides the purpose of the section is to establish health care facility zones around certain health care facilities so those facilities can "provide health services that are free from shouting and other amplified sounds."  (Doc. 43-8, at 8; Doc. 53-1, at 8.)   To be sure, A.G.C. § 3-6-1(a) provides:

> It shall be unlawful for any person to make, continue or cause to be made or continued to permit to be made, continued or caused any loud, unnecessary or unusual noise or any noise which either annoys, disturbs, injures or endangers the comfort, repose, health, peace or safety of others in Augusta-Richmond County.

---

[5] Defendants rely on Dr. Broadnax's testimony in their briefing to support their arguments that the New Ordinance is narrowly tailored, and Parties spend considerable time discussing this testimony.  (See Doc. 43-1, at 5; Doc. 53, at 16-18; Doc. 58, at 3.)  This testimony, however, was taken at Dr. Broadnax's deposition, and there is no showing that law makers relied on it or similar testimony in passing the New Ordinance.  For the reasons explained herein, Dr. Broadnax's testimony does not amount to more than *post hac* justification for the New Ordinance and is, therefore, not persuasive to establish a significant government interest at the time the New Ordinance was passed.  See Kennedy, 597 U.S. at 543 n.8.

(Doc. 43-8, at 3; Doc. 53-1, at 3.)  But there is no explanation why such protection is necessary, much less any connection between loud noises and adverse health effects on patients.

Defendants rely on Pine v. City of W. Palm Beach, 762 F.3d 1262 (11th Cir. 2014) for support that the ordinance is constitutional.  (Doc. 43-1, at 4-5.)  There, the Eleventh Circuit analyzed a City of West Palm Beach (the "City") noise ordinance nearly identical to the one at issue here and held the district court did not abuse its discretion in denying a preliminary injunction because the plaintiffs did not show a likelihood of success on the merits of their First Amendment challenge.  Id. at 1267, 1268, 1276.   Like ARC, the City asserted it had a "substantial interest in protecting its citizens from unwelcome noise and in preserving quiet in areas surrounding health care facilities."  Id. at 1269 (internal quotation marks and citations omitted).  The Eleventh Circuit noted "[t]he district court found that the [government] indeed ha[d] substantial interests in protecting citizens and the area surrounding health care facilities from unwelcome noise," and the Eleventh Circuit agreed such interests were significant.  Id. (quoting Ward, 491 U.S. at 796) (alterations adopted) (internal quotation marks omitted).

Pine is distinguishable from the present case because there was ample evidence the City actually relied on the substantial interest it asserted at trial.  Id. at 1266.  The Eleventh Circuit

15

noted that, before amending the noise ordinance, the City held a public hearing at which a physician "testified that stressful noise increases blood pressure and heart rate, which can cause complications and infections for patients undergoing medical procedures." Id. The physician further testified that "noise pollution," especially "stressful noise pollution," is a "significant risk factor in patient care." Id. The physician also explained the science behind his conclusion and "brought the City dozens of articles detailing medical studies" discussing the adverse effects of noise pollution on patients recovering from medical procedures. Id. A City Commissioner even acknowledged the City "ha[d] substantial testimony in [its] record that says that amplified noise and noise that impacts upon a person going through any medical procedure can damage their health." Id. It was only after conducting this hearing that the City amended its noise ordinance to prohibit shouting and amplified sound within 100 feet of a health care facility's property line. Id. at 1266–67.

Here, as mentioned above, there is no evidence the ARC Commissioners held a public hearing and received testimony or other evidence concerning the adverse effects of noise on patient health. Furthermore, the evidentiary record also does not support a finding that the ARC Commissioners even considered the testimony described in Pine, or any testimony or evidence on the adverse health effects

16

noise can cause medical patients.   Without any evidence the ARC Commissioners relied on its interest in preventing the adverse effects loud noises have on patients when it amended A.G.C. § 3-6-3, the Court finds summary judgment inappropriate.   See <u>Messina v. City of Fort Lauderdale</u>, 546 F. Supp. 3d 1227, 1249-51 (S.D. Fla. 2021) (concluding plaintiffs were likely to succeed on the merits of their First Amendment challenge to an ordinance because the government did not provide any evidence the ordinance was justified by a significant government interest).   Accordingly, Defendants' motion for summary judgment is **DENIED** as to Plaintiff's claim for declaratory and injunctive relief.

**D. Section 1983 Claims**

Plaintiff asserts false arrest and imprisonment claims under 28 U.S.C. § 1983 against Defendants Roundtree, Whitehead, and Smith in both their official and individual capacities. (Doc. 1, ¶¶ 94-99.)

### 1. Official Capacity Claims

Defendants argue that Eleventh Amendment immunity bars Plaintiff's § 1983 claims against Defendants Roundtree, Whitehead, and Smith in their official capacities.   (Doc. 43-1, at 11.) Plaintiff does not respond to this argument. (See Doc. 53.)   The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by

17

Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  Controlling interpretations of the Eleventh Amendment firmly "establish that an unconsenting [s]tate is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (citation and internal quotation marks omitted).  Eleventh Amendment immunity equally applies to a state's agencies and departments.  Id. Furthermore, Eleventh Amendment immunity "remains in effect when [s]tate officials are sued for damages in their official capacity." Kentucky v. Graham, 473 U.S. 159, 169 (1985).  The Eleventh Amendment bars § 1983 suits absent state waiver of immunity or congressional override.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989).

Plaintiff does not contend Georgia consented to suit under § 1983 or that congressional override permits the claim.  The Court finds Eleventh Amendment immunity is applicable and there is no waiver of the constitutional protection.  As such, Plaintiff's § 1983 claims against Defendants Roundtree, Whitehead, and Smith in their official capacities fail.  Thus, Defendants' motion for summary judgment as to Plaintiff's § 1983 against Defendants Roundtree, Whitehead, and Smith in their official capacities is **GRANTED.**

2. <u>Individual Capacity Claims</u>

Plaintiff also asserts claims under § 1983 against Defendants Roundtree, Whitehead, and Smith in their individual capacity. The Court addresses these claims against each individual Defendant.

a. *Defendant Roundtree*

Plaintiff asserts a § 1983 claim against Defendant Roundtree, the Sheriff of Richmond County, for false arrest and imprisonment on the basis of supervisory liability. (<u>Doc. 1,</u> ¶¶ 96-99; Doc. 53, at 47.) "[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1361 (11th Cir. 2003) (citations omitted). Plaintiff does not allege Defendant Roundtree personally participated in the alleged unconstitutional conduct. Therefore, the Court analyzes his supervisory liability under a causal connection theory.

The requisite causal connection can be established by a history of widespread abuse the supervisor was on notice of yet failed to correct or a custom or policy resulting in deliberate indifference to the plaintiff's constitutional rights. <u>Id.</u> (citations omitted). "The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous." <u>Id.</u> (alteration adopted and citation omitted). Plaintiff concedes the evidentiary record is

19

insufficient to establish a claim of supervisory liability against Defendant Roundtree. (Doc. 53, at 47.) As a result, summary judgment is **GRANTED** as to Plaintiff's § 1983 supervisory liability claim against Defendant Roundtree in his individual capacity.

      b. *Defendant Whitehead*

Plaintiff asserts a § 1983 claim against Defendant Whitehead based on their interaction on September 18, 2020, outlined above. (Doc. 1, ¶¶ 17, 48, 94–99.) It is unclear exactly what kind of § 1983 claim Plaintiff asserts against Defendant Whitehead. Plaintiff alleges Defendant Whitehead violated his constitutional rights by requiring him "to desist from his constitutionally protected protesting activity[] under threat of immediate arrest." (Id. ¶ 97.) Defendants treat this allegation as a First Amendment retaliation claim.[6] (Doc. 43-1, at 15–19.) In response, Plaintiff clarifies he did not intend to bring a First Amendment retaliation claim. (Doc. 53, at 32.) Rather, Plaintiff appears to bring a false arrest claim against Defendant Whitehead. (See id. at 33 (arguing Defendant Whitehead is not entitled to qualified immunity

---

[6] In their reply brief, Defendants also argue Plaintiff's § 1983 claim against Defendant Whitehead is barred by the statute of limitations because Plaintiff filed this lawsuit more than two years after it arose. (Doc. 58, 6–7 (citing Rozar v. Mullis, 85 F.3d 556, 562 (11th Cir. 1996)).) Despite including the statute of limitations as an affirmative defense in their answer, Defendants did not include the defense in their initial motion for summary judgment. (Doc. 20, at 2; see Doc. 43.) The Eleventh Circuit has "held that the district court may, at its discretion, *sua sponte* address the statute of limitations issue" but must first "accord the parties fair notice and an opportunity to present their positions." Rogers v. United States, 569 F. App'x 819, 820–21 (11th Cir. 2014) (citation omitted). Given the advanced stage of this litigation and that summary judgment is proper on the merits, the Court declines to exercise its discretion and *sua sponte* address the statute of limitations.

because "the right to be free from an arrest without probable cause is clearly established" and nothing in the record suggests Defendant Whitehead had arguable probable cause to arrest Plaintiff).) Accordingly, the Court interprets Plaintiff's § 1983 claim against Defendant Whitehead as a false arrest claim.

The Court finds summary judgment on Plaintiff's § 1983 false arrest claim against Defendant Whitehead appropriate. Plaintiff bases his claim on the contention that Defendant Whitehead "had no warrant[] but threatened [him] with arrest if he did not leave the county right of way immediately, and . . . Plaintiff under that threat" in fact left the premises. (Id. at 33; see also Doc. 1, ¶ 97.) But a § 1983 claim for false arrest "concerns *seizures* without legal process," and such a claim "accrue[s] when either the *seizure* ends or the plaintiff is *held* pursuant to legal process." Williams v. Aguirre, 965 F.3d 1147, 1158 (11th Cir. 2020) (emphasis added) (citations omitted). Plaintiff does not contend Defendant Whitehead arrested him; rather, Plaintiff asserts Defendant Whitehead merely *threatened* to arrest him. (Doc. 1, ¶ 97; Doc. 53, at 33.) "An officer who did not participate in the actual arrest and who was not the arresting officer's supervisor cannot be liable for false arrest under § 1983." Hastings v. City Fort Myers, No. 2:17-CV-507, 2018 WL 3136001, at *4 (M.D. Fla. June 27, 2018) (citing Brown v. City of Huntsville, 608 F.3d 724, 737 (11th Cir. 2010)). Accordingly, summary judgment

is **GRANTED** as to Plaintiff's § 1983 claim against Defendant Whitehead in his individual capacity.

    c. *Defendant Smith*

Plaintiff's allegations against Defendant Smith are based on his alleged conduct in response to a call at APWHC on November 20, 2020, outlined above. (Doc. 1, ¶¶ 15, 38-41, 94-99; Doc. 43-15, at 31:4-7; Def. Smith's Bodycam.) Again, as an initial matter, the Parties dispute what kind of § 1983 claim Plaintiff brings against Defendant Smith. Plaintiff states he brings a false arrest and imprisonment claim. (Doc. 1, ¶¶ 95-96.) In their motion for summary judgment, Defendants address Plaintiff's claim as a malicious prosecution claim because, in their view, Plaintiff was arrested pursuant to a warrant. (Doc. 43-1, at 12 (citing Giles v. Manser, 757 F. App'x 891, 895 (11th Cir. 2018)).) Plaintiff argues a malicious prosecution claim is inappropriate because Defendant Smith did not arrest him pursuant to a warrant because Defendant Smith did not procure a warrant until hours after the arrest. (Doc. 53, at 34.)

Whether a false arrest, false imprisonment, or malicious prosecution claim is proper turns on whether Defendant Smith arrested Plaintiff pursuant to a warrant. See Aguirre, 965 F.3d at 1158. A false arrest or imprisonment claim is appropriate when there is a seizure without legal process, such as a warrantless arrest. Id. (citing Wallace v. Kato, 549 U.S. 384, 388-89 (2007)). Malicious prosecution, on the other hand, "requires a seizure

pursuant to legal process," and "warrant-based seizures fall within this category." Id. (citations omitted).

Here, the evidence demonstrates Defendant Smith did not arrest Plaintiff pursuant to a warrant. Defendant Smith's "Arrest Information Sheet" indicates Plaintiff was arrested for criminal trespass at 11:33 a.m. (Doc. 43-7, at 1.) The warrant, however, was not obtained until 5:26 p.m. (Id. at 5.) Indeed, in Defendant Smith's "Case Report," he states he did not secure the warrant until after arresting Plaintiff and transporting him to the Charles B. Webster Detention Center. (Id. at 4.) Thus, the Court finds Defendant Smith did not arrest Plaintiff pursuant to a warrant and analyzes Plaintiff's claims against Defendant Smith as claims for false arrest and imprisonment.

### i. False Arrest

Plaintiff contends Defendant Smith violated his Fourth Amendment rights by arresting him without a warrant and without probable cause. (Doc. 1, at ¶¶ 94-96; Doc. 53, at 33-37.) "A warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a [§] 1983 claim." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation omitted). If the officer had probable cause at the time of arrest, then Plaintiff's § 1983 claim for false arrest fails. Id. (citation omitted). An officer has probable cause when "the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause

a person of reasonable caution to believe that a criminal offense has been or is being committed." Brown, 608 F.3d at 734 (citation omitted).

Defendant Smith argues he is entitled to qualified immunity on Plaintiff's false arrest claim. (Doc. 58, at 8.) "To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown, 608 F.3d at 734 (citations omitted). An officer has arguable probable cause when "reasonable officers in the same circumstances and possessing the same knowledge as the [arresting officer] could have believed that probable cause existed to arrest [the p]laintiff." Id. (citations omitted). If law enforcement officials reasonably but mistakenly conclude probable cause is present, the officials are entitled to immunity. Id. at 734-35 (citations omitted). The standard is an objective one and does not include inquiry into the officer's subjective intent or beliefs. Rushing v. Parker, 509 F.3d 1263, 1266 (11th Cir. 2010) (citation omitted).

"Whether an officer has probable cause or arguable probable cause, or neither, depends on the elements of the alleged crime and the operative fact pattern." Gates v. Khokhar, 884 F.3d 1290, 1298 (11th Cir. 2018) (internal quotation marks and citation omitted). Showing arguable probable cause does not require proving every element of a crime. Scarbrough v. Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001). An officer is protected by qualified

immunity if the officer "had arguable probable cause to arrest for *any* offense." Brown, 608 F.3d at 735 (citation omitted).

Defendants argue Defendant Smith had arguable probable cause to arrest Plaintiff for criminal trespass based on the video the APWHC employee showed him. (Doc. 43-1, at 13; Doc. 58, at 8.) Georgia law provides that a person commits criminal trespass "when he or she knowingly and without authority . . . [e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner[ or] rightful occupant . . . that such entry is forbidden." O.C.G.A. § 16-7-21(b)(2). The Parties do not dispute APWHC's management informed Plaintiff he was not allowed on APWHC's property before November 20, 2020. (See Doc. 43-3, at 19, 24; Doc. 53-2, at 4.) Thus, Plaintiff's § 1983 false arrest claim against Defendant Smith turns on whether Defendant Smith had arguable probable cause to believe Plaintiff entered APWHC's property. See Brown, 608 F.3d at 734 (citations omitted); see also O.C.G.A. § 16-7-61(b)(2).

The Court finds there remains a genuine dispute of material fact on this issue. While the video the APWHC employee showed Defendant Smith shows there was a protester in APWHC's parking lot, the protester in the video is wearing light-colored pants. (Def. Smith's Bodycam, at 1:25-1:27.) In the background of the video, there is a person wearing dark-colored clothes on the right-of-way. (Id. 1:30.) When Defendant Smith confronted and ultimately arrested Plaintiff, Plaintiff can be seen wearing dark-

25

colored clothes like the person in the background of the APWHC employee's video. (Id. at 1:25-27, 1:30, 3:18-3:52.) Moreover, Plaintiff's colleague informed Deputy Pizzino that, while Plaintiff never entered the APWHC parking lot, someone else protesting that day did. (Pl.'s Colleague's Bodycam, Doc. 54, at 6:22-6:28.) Based on this, the Court finds there exists a genuine dispute of material fact as to whether Plaintiff was the person who entered APWHC's parking lot in the employee's video. As a result, summary judgment is **DENIED** as to Plaintiff's § 1983 false arrest claim against Defendant Smith in his individual capacity.

       ii. False Imprisonment

Plaintiff also brings a false imprisonment claim against Defendant Smith under § 1983. (Doc. 1, at ¶¶ 94-96; Doc. 53, at 34.) "A detention on the basis of a false arrest presents a viable [§] 1983 action." Ortega, 85 F.3d at 1526 (citations omitted). "Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under [§] 1983 for false imprisonment based on a detention pursuant to that arrest." Id. (citation omitted). The Parties do not dispute that, after Defendant Smith arrested Plaintiff, he took Plaintiff to the Charles B. Webster Detention Center where Plaintiff was detained. (Doc. 43-7, at 4; Doc. 43-15, at 13:7-10, 48:19-20; Doc. 53, at 34.) Therefore, Plaintiff's § 1983 false imprisonment claim turns on whether Defendant Smith had arguable probable cause to arrest Plaintiff in the first place. See Ortega, 85 F.3d at 1526 (citation omitted).

As outlined above, there is a genuine dispute of material fact as to whether arguable probable cause existed to arrest Plaintiff. Accordingly, summary judgment is also **DENIED** as to Plaintiff's § 1983 false imprisonment claim.

**E. Section 1988 Claim**

Plaintiff seeks attorney's fees and expenses of litigation under 42 U.S.C. § 1988. (Doc. 1, ¶ 100.) 42 U.S.C. § 1988(b) allows the Court to award the prevailing party in a § 1983 suit reasonable attorney's fees. "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988." Hensley v. Eckerhart, 461 U.S. 424, 440 (1983). Because the Court finds summary judgment inappropriate, in part, as to Plaintiff's claims brought under § 1983, summary judgment as to his § 1988 claim is also **DENIED**.

**F. State Law Claims**

Plaintiff alleges Defendants Roundtree and Smith are liable under Georgia law for false arrest and false imprisonment in their official and individual capacity. (Doc. 1, ¶¶ 101-07.) However, as stated above, Deputy Smith did not arrest Plaintiff pursuant to a warrant because the warrant was not issued until hours after Plaintiff was arrested. (Doc. 43-7, at 1, 4, 5.) Plaintiff concedes that "false arrest is not a proper claim in this case under Georgia law," because false arrest "is detention under process of law." (Doc. 53, at 39 n.4); Sheffield v. Futch, 839 S.E.2d 294, 300 (Ga. Ct. App. 2020) (citation omitted).

Accordingly, summary judgment is **GRANTED** to the extent Plaintiff brings state-law false arrest claims against Defendants Roundtree and Smith.

Defendants contend they are entitled to sovereign immunity for the Georgia-law claims brought against them in their official capacity. (Doc. 43-1, at 22.) Under Georgia law, sovereign immunity bars all claims against the State, including its counties and county officers. Gilbert v. Richardson, 452 S.E.2d 476 (Ga. 1994). A county's immunity is not waived for any cause of action unless authorized by statute. O.C.G.A. § 36-1-4. The burden is on the plaintiff to identify a waiver of sovereign immunity. Coosa Valley Tech. College v. West, 682 S.E.2d 187, 190 (Ga. Ct. App. 2009).

Plaintiff points to no statute that waives Defendants' sovereign immunity. (Doc. 53, at 38-42, 48-49.) To clarify, sovereign immunity and official immunity are "distinct doctrines." State v. Int'l Indem. Co., 823 S.E.2d 806, 810 (Ga. Ct. App. 2019). "[S]*overeign* immunity shields from suit the State and its departments and agencies, including claims against the State's officers or employees in their *official* capacity." Id. In contrast, "*official* immunity provides public officers and employees limited protection from suit in their *personal* capacity." Id.

Plaintiff cites Gilbert and discusses how there "the county had waived its sovereign immunity by the purchase of liability insurance." (Id. at 48 (citing 452 S.E.2d at 480-81).) But Plaintiff makes no claim the Defendants purchased liability insurance. Likewise, Plaintiff discusses how Defendant Roundtree may be liable for false imprisonment to the extent sovereign immunity was waived. (Doc. 63, at 11-12.) But again, Plaintiff does not argue sovereign immunity was waived by statute. Thus, Plaintiff failed to demonstrate sovereign immunity is inapplicable, as was his burden. Coosa Valley, 682 S.E.2d at 190. Therefore, Defendants' motion for summary judgment as to Plaintiff's state-law claims against Defendants Roundtree and Smith in their official capacity is hereby **GRANTED**.

The Court now addresses Plaintiff's remaining state-law false imprisonment claims against them, in their individual capacities, in turn.

### 1. Defendant Roundtree

Plaintiff advances a novel legal theory under Georgia law: Defendant Roundtree may be liable for Deputy Smith's actions in his individual capacity based on respondeat superior. (Doc. 53, at 48-49.) Plaintiff cites Gilbert, 452 S.E.2d 476, for support. (Id. at 48.) There, the plaintiffs sued a county sheriff and a sheriff's deputy for injuries sustained when they were involved in a car accident with the deputy. Id. at 478. The Georgia Supreme

29

Court held the plaintiff's claims against the deputy were barred by official immunity. Id. However, the court held the plaintiff's claims against the sheriff could proceed because the deputy's immunity from personal liability did not extend to the sheriff, and liability insurance coverage the county obtained by participating in the Georgia Interlocal Risk Management Agency waived the sheriff's sovereign immunity defense. Id. at 477-78.

Plaintiff gleans from this case that Defendant Roundtree may be sued in his individual capacity based on respondeat superior. (Doc. 53, at 48-49.) Defendants argue Plaintiff's reading of Gilbert is incorrect because "[n]owhere in Gilbert does the court hold that a sheriff can be liable in his individual capacity under respondeat superior." (Doc. 58, at 10.) Moreover, Defendant argues that language in Seay v. Cleveland, 508 S.E.2d 159 (Ga. 1998), and Nichols v. Prather, 650 S.E.2d 380 (Ga. Ct. App. 2007), forecloses Plaintiff's argument. (Doc. 58, at 10.)

In Seay, the court provided the following:

> For the benefit of both the bench and bar, we reiterate what we said in Gilbert: a sheriff sued in his official capacity may be held liable for the negligent performance of ministerial or discretionary acts of his employees only to the extent the county has waived sovereign immunity because he can only be sued in his official capacity under respondeat superior. As to acts or omissions personal to the sheriff, however, he may be sued in his personal capacity and will be protected from such suits only to the extent official or qualified immunity applies.

508 S.E.2d at 161 n.1 (emphasis added) (citations omitted). In Nichols, the Georgia Court of Appeals noted "a sheriff may only be

sued in his *official capacity* under respondeat superior for his employees' negligent performance of their official functions." 650 S.E.2d at 380 n.6 (emphasis added).[7]

The Court agrees with Defendants that Seay and Nichols foreclose Plaintiff's arguments. First, the language from Seay suggests a sheriff cannot be liable in his personal capacity under a respondeat superior theory because the actions of his deputies are not "personal to [him]." 508 S.E.2d at 161 n.1. The Court finds its decision further supported by Nichols. Plaintiff argues the Court should not rest its decision on this dictum. (Doc. 63, at 18.) However, as Plaintiff points out, when the Court is faced with a novel issue of state law in a diversity case, the Court is "bound to decide the case the way it appears the state's highest court would, and [the Court] would be violating that duty to ignore [dictum from the Georgia Supreme Court]." (Id. (quoting Towne Realty, Inc. v. Safeco Ins. of Am., 854 F.2d 1264, 1269 n.5 (11th Cir. 1988)).) Given the language from Seay and Nichols, the Court finds there is enough support to predict the Georgia Supreme Court would find a sheriff cannot be held liable in his individual capacity under respondeat superior. Accordingly, summary judgment is **GRANTED** as to Defendant Roundtree.

---

[7] As noted above, summary judgment has been granted as to Plaintiff's claims against Defendants Roundtree and Smith, in their official capacities.

2. Defendant Smith

Plaintiff also brings a false imprisonment claim under state law against Defendant Smith.  (Doc. 1, ¶¶ 101–07.)  "False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20.  The essential elements of false imprisonment "are a detention of the person of another for any length of time, and the unlawfulness of that detention." Smith v. Wal-Mart Stores E., LP, 765 S.E.2d 518, 521 (Ga. Ct. App. 2014) (citation omitted).  Probable cause, by itself, is not a complete defense to false imprisonment because, even if it exists, a warrantless arrest is still illegal unless it was done pursuant to one of the "exigent circumstances" listed in O.C.G.A. § 17-4-20(a).  Arbee v. Collins, 463 S.E.2d 922, 926 (Ga. Ct. App. 1995) (citation omitted).  "Thus, the defense of a warrantless arrest in a false imprisonment case must show that the arrest was made on probable cause and pursuant to the appropriate exigent circumstances." Id. (citation omitted).  The standard for probable cause under Georgia law and federal law are the same.  State v. Thurmond, 416 S.E.2d 529, 530-31 (Ga. Ct. App. 1992) (citing Durden v. State, 297 S.E.2d 237, 239-40 (Ga. 1982)).  As discussed above, there is a genuine dispute of material fact as to whether Defendant Smith had probable cause to arrest Plaintiff.

Defendant Smith also raises official, or qualified, immunity as a defense to Plaintiff's state-law false imprisonment claim. (Doc. 43-1, at 22-23; Doc. 58, 9-10.)  Official immunity "protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without willfulness, malice, or corruption."  McDowell v. Smith, 678 S.E.2d 922, 924 (Ga. 2009) (citation omitted).  Thus, official immunity will bar Plaintiff's claim unless Defendant Smith "(1) negligently performed a *ministerial* duty, or (2) acted with actual malice or an actual intent to cause injury while performing a *discretionary* duty."  Lincoln Cnty. v. Edmond, 501 S.E.2d 38, 41 (Ga. Ct. App. 1998) (emphasis in original) (citing GA. CONST. of 1983, art. I, § II, ¶ IX(d) (as amended 1991); Teston v. Collins, 459 S.E.2d 452 (Ga. Ct. App. 1995)).

"It is well established that 'a warrantless arrest for conduct occurring in an officer's presence is a discretionary act.'" Turner v. Jones, No. CV 209-013, 2011 WL 4929601, at *3 (S.D. Ga. Oct. 17, 2011) (quoting Selvy v. Morrison, 665 S.E.2d 401, 404 (Ga. Ct. App. 2008)).  The Parties do not dispute Defendant Smith's conduct was a "discretionary act." (Doc. 43-1, at 23; Doc. 53, at 40.)  To determine whether an officer is entitled to official immunity for a discretionary act, the Court must evaluate the officer's subjective intent.  Turner, 2011 WL 4929601, at *3 (citing Jordan v. Mosley, 487 F.3d 1350, 1357 (11th Cir. 2007)).

Official immunity will not protect an officer if the officer acted "with actual malice or actual intent to cause injury" in performing a discretionary act. Selvy, 665 S.E.2d at 404.

"In the context of Georgia's official immunity doctrine, 'actual malice' requires a deliberate intention to do wrong. A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be intent to cause the harm suffered by the plaintiffs." Mommies Props., LLC v. Semanson, 880 S.E.2d 376, 385-86 (Ga. Ct. App. 2022) (quoting Williams v. Dekalb Cnty., 840 S.E.2d 423, 434 (Ga. 2020)). "Moreover, the phrase 'actual intent to cause injury' has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." Id. (quoting Wyno v. Lowndes Cnty., 824 S.E.2d 297, 304 (Ga. 2019)). "Given that the official immunity determination hinges on an evaluation of the [officer]'s subjective intent, summary judgment is improper where the plaintiff raises a genuine issue of material fact about a[n officer]'s intent in pursuing the discretionary act." Turner, 2011 WL 4929601, at *3 (citations omitted).

The Court finds summary judgment inappropriate on Plaintiff's state-law false imprisonment claim. Defendant Smith relied on the APWHC employee's video of a protester trespassing on APWHC's property when he arrested Plaintiff. (Doc. 43-15, at 39:1-3,

39:15-25, 41:13-19, 51:7-12.)  As discussed above, the evidence is unclear if the video truly depicted Plaintiff.  While Plaintiff was being arrested and searched by Defendant Smith, Plaintiff's colleague informed Deputy Pizzino that, although Plaintiff had not stepped into APWHC's parking lot, another protester had.  (Pl.'s Colleague's Bodycam, at 6:22-6:28.)  In his deposition, Defendant Smith stated he had been to APWHC's facility once before November 20, 2020, and some APWHC employees pointed Plaintiff out to him.  (Doc. 43-15, at 20:1-22:22.)   However, Defendant Smith also repeatedly said he was sure the protester trespassing in the video the APWHC employee showed him was Plaintiff.  (Id. at 34:20-22, 35:3-16, 39:9-25, 41:13-19, 42:12-18.)   The Georgia Court of Appeals "ha[s] determined that summary judgment on the ground of official immunity was inappropriate where a jury could reasonably infer that the officers knew that the person they arrested had not committed the crimes for which they accused him, thereby deliberately intending to do a wrongful act." Schultz, 874 S.E.2d at 846 (citation omitted).  Based on the evidence discussed above, the Court finds there is a genuine dispute of material fact as to whether Defendant Smith knew Plaintiff was not the person who trespassed into APWHC's parking lot in the APWHC employee's video.  Therefore, summary judgment is **DENIED** as to Plaintiff's state-law false imprisonment claim against Defendant Smith.

3. <u>Attorney's Fees under Georgia Law</u>

Plaintiff seeks to recover attorney's fees under O.C.G.A. § 13-6-11. (Doc. 1, ¶ 108.) "A prerequisite to any award of attorney fees under O.C.G.A. § 13-6-11 is the award of damages or other relief on the underlying claim." <u>United Cos. Lending Corp. v. Peacock</u>, 475 S.E.2d 601, 602 (Ga. 1996). As the Court discussed, Plaintiff's claim for false imprisonment under Georgia law against Defendant Smith remains. Accordingly, summary judgment is **DENIED** as to Plaintiff's request for attorney's fees under O.C.G.A. § 13-6-11.

## III. PLAINTIFF'S MOTION TO BIFURCATE

Plaintiff moves the Court to bifurcate the trial. (Doc. 37.) Federal Rule of Civil Procedure 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues[ or] claims . . . . When ordering a separate trial, the court must preserve any federal right to a jury trial." Plaintiff asks the Court to bifurcate the trial by first holding a hearing on the injunctive relief requested, which alleges A.G.C. § 3-6-3 is unconstitutional on its face and as applied to Plaintiff; then, once the constitutional issue is decided, holding a jury trial on the factual issues and any damages that may be appropriate as to the remaining issues. (Doc. 37, at 2-3.) Plaintiff states such bifurcation will "conserve judicial resources and . . . avoid jury

confusion" because, although Plaintiff's damages claims present jury questions, Plaintiff's claims for declarative and injunctive relief do not.  (Id. at 2–4.)  Defendants represent they do not oppose Plaintiff's motion.   (Doc. 38, at 1.)   Upon due consideration, the Court **GRANTS** Plaintiff's motion to bifurcate (Doc. 37).

## IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Plaintiff's unopposed "Motion to Bifurcate Trial and to Combine Hearing on Interlocutory Injunction with Trial on Permanent Injunction" (Doc. 37) is **GRANTED**, and Defendants' motion for summary judgment (Doc. 43) is **GRANTED IN PART and DENIED IN PART**.  As summary judgment has been granted on all claims against Defendants Roundtree, Whitehead, and John Doe 1–6, the Clerk is **DIRECTED** to **TERMINATE** them as Parties to this action.  The Court will schedule a hearing on Plaintiff's request for permanent and interlocutory relief, then the case **SHALL** proceed to trial on all remaining claims in due course.

**ORDER ENTERED** at Augusta, Georgia, this 25th day of March, 2024.

```
_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
```